Argued and submitted May 1, affirmed September 12, 2007

## SAIF CORPORATION,
*Petitioner,*

*v.*

## Kent BOWERS
and Terry Bowers,
dba B & W Car Wash;
and Department of Consumer and Business Services,
*Respondents.*

Workers' Compensation Board
0406920NC; A131702

168 P3d 263

Jerome P. Larkin argued the cause and filed the briefs for petitioner.

David W. Hittle argued the cause for respondents Kent Bowers and Terry Bowers. With him on the brief was Swanson, Lathen, Alexander & McCann.

Richard Wasserman waived appearance for respondent Department of Consumer and Business Services.

Before Schuman, Presiding Judge, and Ortega, Judge, and Carson, Senior Judge.

SCHUMAN, P. J.

**SCHUMAN, P. J.**

SAIF Corporation seeks judicial review of an order of the Department of Consumer and Business Services (DCBS) ruling that employer successfully reestablished its coverage under a SAIF workers' compensation policy as of May 17, 2004. SAIF acknowledges that it had accepted overdue documents and premiums by May 17, but maintains that its coverage of employer was not reinstated until July 16, 2004, because employer did not apply for reinstatement until that date.[1] We affirm.

Employer B & W Car Wash, owned by respondents Kent and Terry Bowers, was covered by a SAIF workers' compensation insurance policy from February 2, 2000 through April 15, 2004. On at least eight occasions during that period, employer did not pay its premium on time or submit required payroll reports. When that happened, SAIF (as was its practice) sent an "advance termination notice" warning employer that "[c]overage under your policy, and the associated guaranty contract" would be "terminated" effective on a stated date, but also stating,

> "If SAIF receives the completed payroll report before the termination date, your insurance policy will remain in effect and there will be no lapse in your coverage.
>
> *"Please be aware that repeated late payments and termination notices may cause increased rates or jeopardize your coverage."*

(Emphasis in original.) On at least six occasions, employer supplied the overdue documentation or premiums before the stated termination date, and SAIF sent employer a "withdrawal of termination" letter stating, "We have withdrawn the termination of your workers' compensation insurance policy with SAIF Corporation. Your coverage remains in effect with no lapse in coverage." On two occasions, however, SAIF received overdue documents or premiums after the stated termination date but sent "withdrawal of termination" letters nonetheless.

---

[1] The issue arose because one of employer's employees was injured at work on July 12, 2004, and SAIF denied coverage. The employee received compensation from another source and did not appeal the denial.

In the present case, SAIF sent employer an advance termination notice on March 12, 2004, because employer had not filed a required payroll report. The notice informed employer that its workers' compensation coverage would be terminated at midnight, April 15, 2004; the notice also contained the customary statement that receipt by SAIF of the report before that date would keep employer's coverage in effect without a lapse. SAIF also sent employer a bill for $17, due on April 25, 2004, but with the warning, "You have received a termination notice for past due premium or payroll report. The due date on this invoice does not extend coverage beyond the termination date of that notice."

Shortly thereafter, and before the April 15 date of threatened termination, Kent Bowers—according to his uncontradicted testimony before the administrative law judge (ALJ) who heard and decided the case—telephoned SAIF, and an employee assured him that his "workman's comp insurance would be okay as long as I got [the payroll report] to them." Bowers sent the completed payroll report and a check for $17 to SAIF on April 13, 2004. Two days later, SAIF terminated employer's policy for "collection reasons." The ALJ made no finding regarding whether SAIF had received the report and check before terminating the policy; he found only that SAIF received them by May 17, 2004, the day that SAIF negotiated employer's check and credited its account.

After one of employer's employees was injured on July 12, Bowers—again, according to his uncontradicted testimony—received a notice from "the State of Oregon" informing him that he was a noncomplying employer. He telephoned SAIF on July 16 to inquire about the status of his coverage and was told, after a SAIF employee looked in employer's file and discovered that SAIF had cashed the $17 check and received his payroll records, "You're reinstated immediately." SAIF sent employer a letter that same day, stating that its insurance "with SAIF Corporation was reinstated on the date indicated above [July 16, 2004]. Our records indicate that no coverage was in effect from April 16, 2004, through July 15, 2004." SAIF subsequently issued employer an insurance policy, using the same policy number that existed before the April 15, 2004, termination.

On July 6, 2004, DCBS sent employer a final order assessing a $1,000 fine because employer neither had workers' compensation insurance nor was a self-insured employer between April 16 and July 16, 2004. Employer requested a hearing, contending that its status as a noncomplying employer ended before July 16 and that, even if it did not, employer nonetheless had coverage from SAIF from the time SAIF accepted employer's premium and payroll documents. The ALJ concluded that, between April 16 and July 16, no guaranty contract between SAIF and DCBS was on file with the director of DCBS as required by ORS 656.017(1), and that, for that reason, employer was out of compliance during that entire period.[2] *See King v. Dept. of Ins. and Finance*, 126 Or App 1, 5, 867 P2d 511, *rev den*, 319 Or 149 (1994) (employer was noncomplying because it did not cause a guaranty contract to be filed with predecessor to DCBS). Employer does not seek judicial review of that conclusion.

However, the ALJ also concluded that, even though employer was noncomplying for the entire period, employer nonetheless had "coverage" as of May 17, 2004. The ALJ relied on ORS 656.419(3):

> "Workers' compensation is effective when the application of the subject employer for coverage together with any required fees or premium are received and accepted by an authorized representative of an insurer."

The ALJ reasoned, "SAIF acknowledged that it had both the premium payment and payroll report by May 17, 2004. SAIF 'accepted' those items when it negotiated the employer's check and credited its account." The ALJ further noted the uncontradicted testimony of SAIF's collections manager that SAIF can reinstate a lapsed policy based on its receipt of overdue premiums and documents, and that SAIF did so after employer's July 16 telephone call and some internal deliberations.

On judicial review, SAIF assigns error to the ALJ's interpretation of ORS 656.419(3). According to SAIF, the statute establishes that coverage occurs only after the

---

[2] The ALJ's order is deemed to be the final order of the director of DCBS. ORS 656.740(5)(a).

insurer receives and accepts (1) an "application * * * for coverage" and (2) "any required fees or premiums." In the present case, SAIF argues, one of those essential prerequisites—acceptance of an application for coverage—did not occur. The unambiguous text of the statute, SAIF maintains, indicates that the "application" and the fees or premiums are different items; if the fees or documents could by themselves constitute an application, then the phrase "application * * * together with any required fees or premium" makes no sense. Regarding its employee's testimony that coverage can (and did, on July 16) occur without a formal application, SAIF appears to offer two explanations: first, SAIF argues that, regardless of the employee's testimony, SAIF does not have the authority to vary from the terms of ORS 656.419, which requires strict compliance; and second, somewhat inconsistently, SAIF argues that its employee testified only that SAIF has the *discretion* to establish coverage without a formal application and chose to do so on July 16 only after internal deliberations.

We conclude that SAIF's reading of ORS 656.419(3) is unjustifiably crabbed. No statute or rule specifies what an employer must do to "apply" for coverage or defines the term "application." In ordinary usage, an "application" is "the act of applying," that is, an "APPEAL, REQUEST, PETITION," as in an application "to an underwriter for insurance." *Webster's Third New Int'l Dictionary* 105 (unabridged ed 2002). Nothing indicates that a specific writing is required, and, indeed, SAIF's act of conferring coverage on employer as of July 16, 2004, having received only a premium and payroll records, confirms that it shares that understanding. Nor does the phrase "application * * * together with any required fees or premium" indicate, as SAIF contends, that the insurer cannot ever receive and accept an application and premium in the form of a single document. In the context of this case, that is what SAIF did. It is undisputed that, by the time SAIF accepted employer's premium, employer knew that its coverage was in jeopardy and SAIF knew that employer knew. When it received employer's premium and payroll records, SAIF must have regarded them as an application for coverage, and negotiating the check properly must be interpreted as accepting that application.

Affirmed.